G.K. v S.T. (2024 NY Slip Op 50880(U))

[*1]

G.K. v S.T.

2024 NY Slip Op 50880(U)

Decided on July 8, 2024

Supreme Court, New York County

Waterman-Marshall, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 8, 2024
Supreme Court, New York County

G.K., Plaintiff,

against
S.T., Defendant.

Index No. xxxxxx/2021

Plaintiff-Wife is represented by Blank Rome, LLP, Brett Ward, Esq. [brett.ward@blankrome.com] and Grace Chamoun-Taranto, Esq. [grace.chamoun@blankrome.com], 1271 Avenue of the Americas, 14th Floor, New York, New York 10020, (212) 885-5335. Defendant-Husband is represented by Kamelia Poppe, Esq. [miapoppe@nylawsa.com], 1345 Avenue of the Americas, 33rd Floor, New York, New York 10105 (212) 792-9501

Kathleen Waterman-Marshall, J.

BRIEF BACKGROUND
The parties, plaintiff-mother G.K. ("Plaintiff") and defendant-father S.T. ("Defendant"), were married for just under 11 years (d/o/m: 11/17/2010; d/o/c: 06/21/2021). They have three daughters, A., 12 (d/o/b: xx/xx/xx), U., 10 (d/o/b: xx/xx/xx), and L., 7 (d/o/b: xx/xx/xx). Plaintiff and the children live in the marital apartment, a three-bedroom, three-bathroom, rent stabilized apartment at [in Manhattan] ("the Marital Apartment") (Plt. Ex. 1a).[FN1]
Defendant lives in the parties' vacation home [in] North Creek, New York ("the North Creek Home"), for at least half of the week and somewhere else (possibly [in Manhattan]) the other half of the week (id.).
The Court tried the custody issues in this case over six days in the spring of 2023 (Plt. Ex. 17 — 22). The credible testimony and evidence established, inter alia, that Defendant is a successful anesthesiologist whose earnings funded a comfortable Manhattan lifestyle for the family, involving private schools for the children, expensive extracurricular activities, including skiing, travel to Europe, and ownership of the North Creek Home. The evidence also established, unequivocally, that Defendant mentally and physically abused Plaintiff and his daughters, resulting in a dysfunctional and traumatic family dynamic and harm to the children, and that [*2]once Plaintiff filed for divorce, Defendant cut his wife and children off financially causing further harm. The Court's findings and conclusions are set forth in great detail in its Decision and Order dated November 7, 2023 ("the Custody Decision") (Plt. Ex. 23), all of which are incorporated herein. The Court awarded Plaintiff sole physical and legal custody of the children, with supervised visitation to Defendant, who has not seen his children since November 2021 except by happenstance.
The financial issues were tried over two days in February 2024. The reasons for the expedited, two-day trial on finances were several. First, in December 2023, Plaintiff filed her third contempt motion against Defendant based upon, inter alia, his violation of the Automatic Orders by liquidating the children's 529 Accounts to purge his 2022 contempt and bail himself out of jail, and his failure to pay the mortgage on the parties' North Creek Home, putting that asset at risk (Plt. Ex. 86). Second, this Court, having presided over this matter since January 2022 and having conducted the custody trial, made certain relevant findings about the family's lifestyle, income, home life, and domestic abuse of which it could take judicial notice on the financial trial (Plt. Ex. 23). Third, pursuant to this Court's Decision and Order dated January 10, 2023 (Plt. Ex. 27), Defendant was "precluded from offering at trial" any financial evidence "to refute Plaintiff's financial claims all of which will be resolved in accordance with Plaintiff's evidence at trial" due to his willful and contumacious failure to participate in discovery proceedings ("the Preclusion Order"). The parties, by their attorneys, thus agreed that the financial issues, as well as those raised in Plaintiff's third contempt motion, would be tried on February 8 and 9, 2024. TRIAL
In support of her case, Plaintiff offered her direct testimony by way of affidavit (NYSCEF VEC 2 Doc. 2-85)[FN2], pursuant to 22 NYCRR 202.16 (n) and this Court's Part Rules, subject to written and oral objections and cross-examination. She offered the expert report (Plt. Ex. 15) and testimony of Alexander Pia ("Mr. Pia"), of Marcum Accountants Advisors ("Marcum"), as to the fair market value of Defendant's 100% ownership interest in his two anesthesiology businesses: [S.T., M.D., LLC ("ST LLC")] and [M.M. Services P.C. ("M.M.")]. Plaintiff also offered the testimony of [Dr. A.X. ("Dr. X.")], one of Defendant's colleagues, who appeared and testified pursuant to subpoena. 
Defendant testified on his own behalf, as limited by the Preclusion Order.
In addition, the Court admitted into evidence a total of 91 exhibits, 56 on behalf of Plaintiff and 35 on behalf of Defendant, many on consent (see, NYSCEF VEC 2 Doc. 2-246). The exhibits included, inter alia, the Decisions and Orders of this Court, the Appellate Division, First Department, and the U.S. Bankruptcy Court; Arrest Warrant, Order of Commitment, and Release on Own Recognizance; transcripts of the 2022 contempt hearing; transcripts of the custody trial; Plaintiff's motion for pendente lite relief, first motion for contempt, second motion [*3]for contempt and preclusion, and third motion for contempt and to appoint a receiver to sell the North Creek Home; relevant emails and text messages containing party admissions about income and earnings; Defendant's TD Ameritrade statements; Plaintiff's Amex spending analysis; photographs of the parties' Marital Apartment; the parties' August 2021 stipulation as to the Marital Apartment; the parties' joint tax returns for 2017 — 2020; Defendant's business returns for 2020 — 2022; Defendant's 2021 personal returns; Alliant mortgage bills; Sharefile Activity Log (showing add-on expenses for children); various invoices for children's add-ons and proof of payment of same by Plaintiff; Marcum's expert report; and Defendant's response to Plaintiff's trial subpoena.
FINDINGS OF FACT
JUDICIAL NOTICE OF FACTS: COURT ORDERS
The Court took judicial notice of all the Decisions and Orders issued in this case by this Court, the Appellate Division, First Department, and the U.S. Bankruptcy Court for the Southern District of New York, and the factual findings and conclusions contained therein. A brief summary of the pertinent court orders are as follows.
On October 25, 2021, the court (Hon. Lori Sattler) signed Plaintiff's Emergency Order to Show Cause for pendente lite relief ("the October 2021 Order") (Def. Ex. SS), in which the court directed Defendant to "immediately pay for the outstanding balance on the children's therapy expenses ($2,400 as of October 2021)" and "to immediately pay any and all arrears and penalties on the late rent for [the Marital] Apartment ($7,500 as of October 20, 2021)" pending the hearing of the motion.
On February 3, 2022, this Court decided Plaintiff's pendente lite motion by Decision and Order of same date ("the February 2022 Order") (Plt. Ex. 24) to the extent of directing Defendant to pay: $3,600 per month in basic child support, and 100% of statutory add-on expenses (unreimbursed medical, including therapy; childcare expenses [au pair]; education expenses; and extra-curricular activities); and spousal support of $8,030 per month (to be paid directly to landlord and utility companies), plus the monthly carrying costs of the parties' Dodge Ram truck. Defendant's support obligation commenced February 2022, although Plaintiff requested that it commence as of October 2021, the date of her Order to Show Cause. The Court also awarded Plaintiff interim attorney's fees of $130,000, subject to reallocation.
Defendant did not make his court-ordered support payments under the October 2021 and February 2022 Orders and did not produce any discovery. Plaintiff moved for contempt and sought emergency interim relief. On March 10, 2022, this Court signed Plaintiff's Order to Show Cause for contempt (Def. Ex. QQ), in which it directed Defendant to produce by March 21, 2022 "all financial documents" related to his medical practice as requested in Plaintiff's October 25, 2021 discovery demand and to timely pay the deposits for the children's private school for the 2022/2023 school year. Defendant submitted written opposition to the contempt motion to which he attached some statements for two TD Ameritrade accounts in his name that held approximately $680,000 (Plt. Ex. 41), otherwise he produced no documents and did not respond to Plaintiff's October 25, 2021 discovery demand.
On March 28 and April 8, 2022, this Court held a full hearing on the contempt motion (Plt. Ex. 14, 16). Plaintiff appeared, with her attorney, and presented her case. Defendant also appeared, with his then attorney, and testified in defense to the contempt allegations. On April 8, 2022, after due deliberation, having heard the parties' testimony and viewed the evidence, this Court granted Plaintiff's motion for contempt and read its decision into the record. In pertinent part, this Court found that Defendant's testimony was "inconsistent" at best and "at worst he flat out lied to this Court," in that he
. . . misrepresented with respect to the source and scope of his income. He appeared to intentionally obfuscate with respect to the payments he actually made over the course of the last six months and certainly in connection with this Court's order. And he outright lied about his ability to make any payments pendente lite on behalf of his own children during the last three or four months. He admitted that from December 2021, January 2022 and February 2022, he withdrew $183,500 from a TD Bank account in addition to his general income and yet had boldly claimed to this court that he had an inability to pay any of the amounts due under this Court's order. Most shocking is that during the time he made these withdrawals, his children's home was being jeopardized. He incorrectly misrepresented or he misrepresented that — testified — he testified several times that the upstate residence was the primary residence of his children, and yet the children reside primarily with Plaintiff in New York City.
The Court found that Defendant had knowledge of the Court's February 2022 Order setting pendente lite support and knew of his support obligations thereunder; had "$183,500 available to him during the period of time that these payments were due and yet did not, by his own admission, use them to secure his own children's home in New York City or pay for their schooling"; and was in contempt of the February 2022 Order in the sum of $174,560 — consisting of $37,500 in rent, $6,000 in tuition, $1,060 in utilities, and $130,000 in interim attorney's fees. The Court directed Defendant to purge his contempt by April 15 or be subject to arrest and incarceration. On April 11, 2022, the Court So-Ordered the April 8, 2022 transcript of its Decision on the contempt motion ("the April 2022 Contempt Order") (Plt. Ex. 26).
Defendant did not purge his contempt by April 15, 2022 and this Court issued a warrant for Defendant's arrest on that date (Plt. Ex. 91). Before the warrant could be served, Defendant filed a voluntary petition for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York (Hon. Martin Glenn) (Plt. Ex. 27). Although the filing stayed execution of the warrant, it did not stay or discharge Defendant's support obligations.
In January of 2022, during the pendency of Plaintiff's pendente lite motion, and prior to the filing of her contempt motion, Defendant moved for an order disqualifying Plaintiff's attorneys and disgorging any fees paid to them. Plaintiff cross-moved for Rule 130 sanctions. By Decision and Order dated May 9, 2022 ("the May 2022 Disqualification Order") (Plt. Ex. 25), this Court denied Defendant's disqualification motion and granted Plaintiff's motion for sanctions. 
Defendant's failure to pay certain of his pendente lite support obligations continued and he accrued arrears of approximately $113,000 as of September 2022. The arrears included, inter [*4]alia, the children's 2022/2023 tuition at the United Nations International School ("UNIS"), which Defendant failed to pay causing them to lose their enrollment in UNIS, and childcare expenses. Other than the TD Ameritrade bank statements submitted in opposition to Plaintiff's first contempt motion, Defendant did not produce any discovery between March 2022 and September 2022. Consequently, Plaintiff moved, for a second time, to hold Defendant in contempt of the February 2022 Order, and she also sought discovery sanctions pursuant to CPLR 3126 for Defendant's willful failure to produce discovery called for in the Preliminary Conference Order, her October 25, 2021 discovery demand, and this Court's March 10, 2022 Order (Def. Ex. X). 
By Decision and Order dated January 10, 2023 ("the Preclusion Order") (Plt. Ex. 27), this Court found Defendant in contempt of the February 2022 Order but did not issue a direction that Defendant pay a sum certain to purge his contempt, as the record showed that some arrears had been paid during the pendency of the motion and it was unclear what amount remained unpaid. The Court did grant Plaintiff's request for discovery sanctions:
On this record, Plaintiff is entitled to an order, pursuant to CPLR 3126, directing Defendant to produce, by February 10, 2023, all discovery called for in the PC Order, the D&I Demand, and the March 10 Order. If he fails to do so, Defendant will be precluded from offering at trial any of the discovery requested therein, or evidence related to same, to refute Plaintiff's financial claims all of which will be resolved in accordance with Plaintiff's evidence at trial.
Defendant failed to produce any documents called for in the Preclusion Order by February 10, 2023, or anytime thereafter. Accordingly, the conditional preclusion became absolute by reason of Defendant's willful and contumacious conduct in refusing to participate in discovery.
The custody trial in this matter took place in April and May 2023 (Plt. Ex. 17-22), with the in-camera Lincoln hearing of the children and the Attorney for the Children on July 31, 2023.
Defendant represented himself at the custody trial, claiming that he lacked funds to hire an attorney. However, simultaneous with the proceedings in this Court, Defendant had attorneys representing him in his bankruptcy case, and separate appellate counsel working on his appeals and motions in the Appellate Division, First Department.
By Order dated May 16, 2023 (Plt. Ex. 29), the Appellate Division, First Department unanimously affirmed this Court's February 2022 Order awarding Plaintiff pendente lite support (identified as a March 8, 2022 Order, the date it was entered in NYSCEF); April 2022 Contempt Order; and May 2022 Disqualification Order.
Meanwhile, in the Bankruptcy Court proceeding, Alliant Credit Union, the mortgage lender on the North Creek Home, sought an order modifying the Automatic Stay and permitting it to foreclose on the mortgage. According to Alliant, the monthly mortgage of $2,489.35 had not been paid from November 1, 2022 through July 1, 2023, and total arrears of $23,620.85 were [*5]due and owing as of August 2023. Defendant, by his bankruptcy attorneys, signed a "Conditional Order Vacating Automatic Stay" in which he agreed to make a $5,000 downpayment by August 1, 2023, followed by monthly payments of $4,655.22 on the 15th of the month starting with September 15, 2023 through December 15, 2023. The attorneys for Alliant also signed the Conditional Order, which Judge Martin Glenn then So-Ordered on August 22, 2023 (Plt. Ex. 43).
Defendant did not make the required payments to Alliant as he had agreed.
Thereafter, Judge Glenn directed Defendant to appear for a hearing on September 13, 2023 to show cause why his bankruptcy case should not be dismissed or converted to a Chapter 7 proceeding. Plaintiff submitted papers in support of dismissal. Defendant did not respond to Judge Glenn's Order to Show Cause. Following the September 13 hearing, Judge Glenn dismissed Defendant's bankruptcy case and "barred [him] from filing any new bankruptcy case under any chapter of the Bankruptcy Code, in the Southern District of New York or any other bankruptcy district, for a period of 180 days from the date of this Order" (Plt. Ex. 28). 
On September 14, 2023, this Court, having been made award of Judge Glenn's Order, issued its own Order (Def. Ex. FF) as follows:
By Order dated September 13, 2023, the United States Bankruptcy Court for the Southern District of New York (Judge Glenn) dismissed Defendant's Bankruptcy Petition (nyscef Doc No.383). Thus, the automatic stay that was applicable to certain proceedings in this divorce action is now terminated (see 11 USC 362[c][2][B]). Any orders, judgments, warrants, or other court directions and proceedings, previously stayed herein by the Bankruptcy Petition are now in full force and effect and subject to enforcement and execution thereon. Attached is a copy of Judge Glenn's Order.
On October 4, 2023, Defendant was arrested on the reactivated and open warrant issued on April 15, 2022 based on the April 2022 Contempt Order (Plt. Ex. 91). Defendant was given the opportunity to purge his contempt before being arrested, but expressly declined to do so, claiming he had no money. The Court issued an Order of Commitment that day and Defendant was committed to the custody of the Sherriff of New York County for delivery to the Department of Corrections to be held for a maximum term of 100 days, unless he purged himself of his contempt by paying $174,500 to Plaintiff (Plt. Ex. 92).
On October 17, 2023, Defendant purged his contempt and bailed himself out of jail by paying Plaintiff the sum of $174,500. He procured the funds by liquidating the children's 529 Accounts. Plaintiff did not consent to using the children's accounts for this purpose (Plt. Ex. 86).
On November 7, 2023, this Court issued its Decision and Order After Custody Trial ("the Custody Decision") (Plt. Ex. 23). As is here relevant, this Court made several factual findings, as follows.
Defendant, an anesthesiologist, was the primary financial support of the family. He earned in or around $600,000 per year from 2011 — 2017; he worked 85-100 hours per week in [*6]various hospitals in the tri-state area but changed his work schedule in late 2017 and opened his own anesthesiology practice. Plaintiff, an attorney, left the work force in 2011 to raise the children; she returned to work in 2018. She obtained a Masters in Fine Art from Columbia University during the marriage, which Defendant paid for at a cost of $65,000 (Custody Decision at 10-11, 21).
The family "enjoyed a comfortable lifestyle paid for by Defendant's earnings and dictated largely by his own interests" (id. at 4). The children had nice clothes, attended private schools, took foreign language classes and engaged in expensive extracurricular activities, including skiing. The family traveled to Europe, and purchased a home in 2019 in North Creek, New York, in furtherance of the children's skiing endeavors. Defendant testified that his income allowed the family to take "nice vacations" and have "so many" helpers in the home (id. at 4-5, 10).
The overwhelming evidence also established that Defendant mentally and physically abused Plaintiff and his daughters. Defendant grabbed and pushed Plaintiff, leaving bruises on her arms, and threw and broke things, often in front of the children. He rampaged against her. He denigrated her in front of the children, calling her names. In one incident, while the parties were staying at an Air B&B, Defendant chased Plaintiff around the home, yelling at her and denigrating her for not having proper food in the home, as she begged for him to leave her alone. Defendant also hit and hurt the children. ACS indicated a report against Defendant as it related to A. Defendant also called the children names; he would ask them if they wanted to be "fat," "a fucking retard," or "ignorant like your mother." Defendant's abuse during the marriage resulted in a dysfunctional and traumatic family dynamic and harm to the children (id. at 5-7, 15, 16-17, 22-23).
Although Defendant had supervised visits with his daughters, he ceased all contact with them as of November 2021, causing further harm. Once Plaintiff filed for divorce, he cut his wife and children off financially. He testified at the custody trial that he had to borrow $100,000 in November 2021 for his supervised visits and $200,000 in 2022 for the bankruptcy proceedings and appeals, but refused to answer questions about who loaned him the money. However, Defendant did not explain his ability to pay for trips to Europe in August 2021 and Italy in 2022 (id. at 1, 13). In addition,
. . . he did not show an inability to pay the family expenses, post-commencement, that he had been paying pre-commencement. Rather, Defendant simply stopped supporting his family, placing the girls' education, home, and health in jeopardy. He did not deny that his refusal to pay the girls' tuition at UNIS resulted in their loss of enrollment; rent on the marital apartment resulted in eviction proceedings; and his delay and default in paying family expenses, including Dr. Deutsch's fees, risked their much-needed therapy. Defendant's abject refusal to support his family destabilized the girls, caused Plaintiff fear, and, quite frankly, was cruel.
In fact, Defendant callously prioritized his litigation strategy over the well-being of his children. Although he borrowed $300,000 during this litigation, not a penny went to pay his [*7]support arrears or for supervised visits with the children he claimed to be "fighting for." Rather, he used the money to pay attorneys to file for bankruptcy and litigate claims that have since been roundly denied and dismissed (id. at 21-22).
By Order to Show Cause, signed by this Court on December 21, 2023 (Plt. Ex. 86), Plaintiff made her third motion for contempt, based upon Defendant's continued failure to pay pendente lite support under the February 2022 Order and for his violation of the Automatic Orders in liquidating the children's 529 Accounts to purge his initial 2022 contempt. She also sought an order permitting her to sell the North Creek Home and manage the distribution of its sale proceeds, due to Defendant's continued failure to pay the mortgage placing the property at imminent risk of foreclosure.
Defendant, now appearing by retained counsel, opposed the motion by his attorney's affirmation (Plt. Ex. 70) in which counsel stated that a "$19,914.80 payment is scheduled to be delivered to the mortgage company" and Defendant is "working with the mortgage company to finalize one of the 3 plans available" to pay off the arrears.
Following an on-the-record conference with the attorneys, given the exigencies of the circumstances, the procedural posture of the case, and the Preclusion Order, the Court scheduled the financial trial for February 8 and 9, 2024. Plaintiff's third motion for contempt and for an order directing the sale of North Creek Home were withdrawn without prejudice, and all factual and legal arguments regarding financial matters and contempt raised therein referred to trial (Def. Ex. BB).
PLAINTIFF'S TESTIMONY AND EVIDENCE
Plaintiff's direct testimony came in by affidavit, subject to Defendant's written and oral objections and motions to strike. Defendant's objections and motions to strike Plaintiff's testimony on the following pages, are denied: Page 2, Question 16; Page 18, Question 282; Page 19, Question 300; Page 21, Question 316; Page 29, Question 413; Page 32, Question 464; Page 36, Question 523; Page 36, Question 525; Page 47, Question 693; Page 48, Question 699; Page 49, Question 712. Defendant's objections and motions to strike Plaintiff's testimony on the following pages, are granted: Page 8, Question 115; Page 15; Question 246; Page 23, Question 336; Page 29; Question 417; Page 30; Question 424; Page 37, Question 543; Page 50, Question 714.
Plaintiff's testimony during the financial trial was consistent with her testimony during the custody trial. She is 44 years old (d/o/b: xx/xx/xx) and Defendant is 51 years old (d/o/b: xx/xx/xx); they are both in generally good health. (As noted in the Custody Decision, Plaintiff has Kikuchi Fujimoto disease which was in remission at the time of the custody trial and relapses are treated by steroids and pain medication.) They were married in a civil ceremony on November 17, 2010 and religious ceremony on November 28, 2010.
Plaintiff has a Juris Doctor from Fordham Law School (2005), and a Masters Degree in Creative Writing from Columbia University (2017). When the parties met in 2010, Plaintiff had [*8]been a practicing attorney working in the public sector with historical earnings of approximately $75,000 per year. She left the work force in 2011 when pregnant with A., the parties' first daughter. Plaintiff did not work outside of the home for seven years and instead raised the parties' three daughters and took care of the home. She returned to work in January 2018, first working for Fordham Law School for a yearly salary of $75,000 (2018-2020). In 2021, she took a position as a Law Professor at Widener University Delaware Law School. Her salary as of January 1, 2024 is $115,000 per year. She works five days per week; two days on campus and three days from home.
Defendant has a medical degree from Ross University School of Medicine and completed a specialized fellowship at New York University. During the marriage, Defendant worked as an anesthesiologist at various hospitals and for private practitioners in the tri-state area. At the beginning of the marriage, he earned approximately $520,000 as a base salary, which would increase to up to $600,000 with side work.
In 2017, Defendant stopped working for all the hospitals except for the VA Hospital and opened up his own private medical practice. Defendant's anesthesiology practices are called [R.A. d/b/a M.M. Services P.C. ("M.M.")] and [S.T. M.D., LLC ("ST LLC")]. Within the first year of opening M.M. and ST LLC, Defendant "quickly grew his business" and "was working six days week, which included evenings." Plaintiff assisted Defendant in operating his business: she reviewed resumes for potential office managers; opened and unpacked medical supply boxes delivered to the family's home; fielded calls for his business; texted his colleagues at his request while he was driving; and was the unofficial social manager for the medical practice for three years.
According to Plaintiff, Defendant handled 4 — 10 cases per day and earned from $3,000 to $4,000, and up to $7,000 to $10,000 per day. Plaintiff knew this because Defendant told her how much he earned, she had unrestricted access to his phone and saw his texts with his colleagues which contained his income and earning information. By Plaintiff's calculation, Defendant earns at least $1,000,000 per year from his anesthesiology businesses.
Plaintiff offered other proof as to Defendant's yearly income, including the 2020, 2021, and 2022 business tax returns of M.M. and ST LLC (Plt. Ex. 3 — 8) and emails and texts between Defendant and his colleagues and sister (Plt. Ex. 58, 63, 90, 95) containing admissions about his earnings and business expenses. The business tax returns show the following for gross revenues:

M.M.

ST LLC

2020

$118,798

2020

$826,634

2021

$1,499,343

2021

$96,050

2022

$1,545,689

2022

$294,933

In a June 21, 2021 email to his colleague, Dr. X., Defendant stated that M.M. has "zero debt" and identified the North Creek Home as the address of the business (Plt. Ex. 95). He does not identify any overhead costs for the business, except to note that there are two employees, himself and [], the "manager," and that he set up a "SEP-IRA for us." He identified "average" monthly "supply costs" of "about 4000-5000 dollars" or $60,000 per year. In a text to his sister P. (Plt. Ex. 58), Defendant stated about Plaintiff's parents that "[t]hey have this crazy lying underachieving daughter married to guy making one million dollars a year."
The family's lifestyle during the marriage matched that of a family with a million dollar a year income. The family's shelter costs amounted to nearly $150,000 per year: over $8,200 per month for the Marital Apartment, which is rent stabilized, and over $4,000 per month for the North Creek Home. They also have a Tesla car ("the Tesla") and a Dodge Ram truck (both in possession of Defendant).
The children attended private schools at a cost of nearly $100,000 per year. They were first enrolled in [] at a cost of $27,000 per year, per child (A. attended for 7 years, U. for 5 years, and L. for 2 years). For the 2021/2022 school year, the children were enrolled in [], which cost $44,000 per child, or $132,000 for the year. Defendant paid the tuition from his earnings, without hesitation or complaint.
Defendant and Plaintiff spent tens of thousands of dollars on activities and camps for the children each year. Defendant insisted on the children learning foreign languages and paid for language tutoring and classes. They paid top dollar for ski coaches and instructors. According to Plaintiff, there was "never any budget on how much we would spend, especially when it came to our children" and there was "never any expense spared" for the children's enrichment activities and education.
The family also went on luxury vacations. They have been to Italy, Chamonix, France, and Turks and Caicos. They dined out in high-end New York City restaurants during the week, including Jacques Brasserie, La Grenouille, and Per Se. Defendant spent several thousands of dollars on wine each year. He purchased Murano glasses and vases during the family trips to Italy.
Defendant purchased clothing, shoes, and jewelry for himself and the family either with cash or on credit cards. Defendant placed a priority on appearance. Plaintiff never had a budget for the children, the home, or herself. According to Plaintiff, Defendant ran the family expenses, including the car payments, through his business. Plaintiff's six-year spending analysis on the family's Amex card (Plt. Ex. 66) shows that they spent approximately $135,000 per year in 2019 and 2020, and approximately $175,000 in 2021 ($200,000 minus approximately $25,000 paid by Plaintiff for attorney's fees in this divorce action, which charges Defendant had reversed as fraud).
In addition to the family's ability to afford a comfortable Manhattan lifestyle, they also saved $1,000,000 in 529 Accounts for the children's education (Plt. Ex. 86) and Defendant saved $680,0000 in TD Ameritrade account (Plt. Ex. 41). They also purchased the North Creek Home [*9]in December 2019 for $750,000 (Plt. Ex. 1a). The home is 5,300 square feet, has 4 bedrooms, a playroom, 3.5 bathrooms, and sits on 5 acres. Alliant holds the mortgage, and the monthly mortgage payment is $2,489.35 (Plt. Ex. 44). The family used the home on the weekends, winter vacations, for ski season, and lived there for some part of the pandemic. Defendant paid the mortgage and carrying costs of the North Creek Home throughout the marriage.
Defendant never complained about paying for any of the family expenses or luxuries from his earnings and income at any time during the marriage. He never complained that the family was spending beyond their means, and he alone controlled the family finances. Sometimes, however, Defendant would put Plaintiff down and tell her she did not deserve his largess. As Plaintiff did not work outside of the home from 2011 — 2017, all of the family expenses were paid for by Defendant's substantial earnings during this period of time. However, Plaintiff did contribute her income to the family expenses when she returned to work in 2018, while she continued to take care of the children, home, and help Defendant with his business.
As of the date of commencement of this action, the marital assets consisted of (Plt. Ex. 1; 1a; 86):
• Real Estate: The North Creek Home, purchased in 2019 for $750,000. (At the time of trial, the outstanding mortgage was approximately $517,000.)
• Businesses: M.M. and ST LLC, Defendant's anesthesiology businesses. Plaintiff's expert, Marcum, valued Defendant's 100% interest in those businesses at $914,000.
• Bank Accounts:
Defendant's Chase account (x3793) with a balance of $74,031.96;
Joint TD account (x7029) with a balance of $7,070; and
Plaintiff's Bank of America account (x8311) with a balance of $4,503.
• Investment Accounts:
Defendant's TD Ameritrade account (x9303) with a balance of $662,387.38.
• Defendant's Retirement Accounts:
Fidelity IRA $393,387.11;
SEP-IRA $ 36,133.02; and
TD Ameritrade Roth IRA $ 97,776.62.
• Plaintiff's Retirement Accounts:
Fidelity IRA $ 53,026 (premarital);
TIAA$105,051 (partially premarital);
NYS Retirement System $ 11,531; and 
TD Ameritrade Roth IRA $ 26,993.
• Children's 529 Accounts: valued at approximately $1,000,000. Defendant has information about the financial institutions in which the 529 Accounts are held (but has failed to disclose the information).
• Automobiles: a Tesla car and a Dodge Ram truck.
Everything changed in Plaintiff and the children's lifestyle when Plaintiff filed for divorce. The court (Hon. Lori Sattler) granted Plaintiff exclusive use and occupancy of the Marital Apartment in August 2021 and, pursuant to the parties' stipulation (Plt. Ex. 88), Defendant entered the apartment when Plaintiff and the girls were not there to obtain his personal belongings. Plaintiff testified, however, that Defendant "ransacked" the apartment. In addition to taking valuable paintings, Indian statutes, expensive Italian glass vases and cups, and thousands of dollars of wine, he took: two Apple computers, an iPad and the family printer that the children used for schoolwork, the landline phone, and "every single dollar of cash in the apartment," amounting to approximately $2,000. He left boxes and Styrofoam behind on the floor. The children were upset when they returned home and saw the condition of the Marital Apartment and that their computers were gone. Plaintiff testified that she is not looking for return of these items, or for their value; she asked that the Court consider Defendant's conduct with respect to these items in its equitable distribution award.
Plaintiff also testified that once she filed for divorce, Defendant, who never had a problem paying any of the family expenses, unilaterally stopped paying the rent and utilities on the Marital Apartment, the children's therapy bills, and their tuition. He cut Plaintiff off from the Amex card and the cell phone account. He stopped paying for the au pair, which Plaintiff still needed as she works full-time, and two days she commutes out of town. He stopped paying the mortgage on the North Creek Home. He stopped paying the carrying costs for the Dodge Ram truck, which Plaintiff used for the children, resulting in a $14,000 lien on the truck for garage fees. Consequently, Plaintiff has not had use of any vehicle throughout this litigation, while Defendant has had exclusive use of the family's Tesla.
The children were kicked out of [school] and could not re-enroll for the 2022/2023 school year because Defendant refused to pay the tuition. Plaintiff enrolled the children in public school, []. They have remained in public school since the 2022/2023 school year.
The landlord of the Marital Apartment commenced eviction proceedings against Plaintiff, which were stayed by Defendant's bankruptcy proceeding. Two days before Judge Glenn dismissed the bankruptcy case, Plaintiff received an email from the landlord stating that Defendant paid $23,568.75 of the rent arrears, but that $8,000 is still owing.
Defendant's failure to pay utilities resulted in countless shut off notices, which Plaintiff has paid without reimbursement from Defendant, despite the court order directing him to pay the utilities. Two days prior to the financial trial, Defendant paid the garage lien on the Dodge Ram truck and removed it from the garage. He now has both family vehicles.
Defendant stopped paying the mortgage during this litigation (Plt. Ex. 45 — 48). He represented to Judge Glenn that he would pay the arrears and make a payment plan (Plt. Ex. 43), but reneged on that agreement. Similarly, in December 2023, in opposition to Plaintiff's third contempt motion, Defendant represented to this Court (Plt. Ex. 70) that he borrowed $20,000 from his friend, K.C., to pay down the mortgage arrears. According to Plaintiff, however, the $20,000 came from Defendant and was not a loan. Plaintiff testified that Defendant's text to his colleague, S., in which he tells S. that will send him "20 k" and asks him to "then mail a check to k. for 20k after you receive it" (Plt. Ex. 63), shows that Defendant paid the $20,000 himself. At the time of the financial trial, approximately $516,123.19 was outstanding on the mortgage, with arrears of $17,623.31 (Plt. Ex. 44).
Plaintiff testified that Defendant's refusal to meet his financial obligations to his family caused great stress and fear for her and the children. They "have experienced countless changes as a result of [Defendant's] financial suffocation," including changing schools and foregoing many of their favorite activities. Plaintiff testified that the children have suffered the most as a result of Defendant's behavior and will continue to suffer because he has not changed. She had to move for pendente lite relief to compel Defendant to pay the rent, children's therapy bills and tuition, and then she had to make no less than three motions for contempt to compel Defendant to pay his court-ordered support obligations. He avoided incarceration in April 2022 for his contempt by filing for bankruptcy. After his bankruptcy case was dismissed, he was incarcerated for his initial contempt and bailed himself out of jail by liquidating the children's 529 Accounts. She notes that all of Defendant's appeals and motions in the Appellate Division from this Court's orders have been denied. Defendant failed to produce any discovery in this divorce action resulting in the Preclusion Order.
Plaintiff testified that the expenses listed in her updated Statement of Net Worth (Plt. Ex. 1a) reflected the family's prior lifestyle during the marriage and that their present expenses are significantly reduced. She also testified that Defendant has not reimbursed her for the childcare, educational, and extracurricular expenses that she incurred, which he has been court-ordered to pay. Plaintiff testified that the family's present monthly expenses are:

Housing

$8,046

Electric

$300 (varies season to season)

Utilities

$94

Groceries

$1,400

[*10]Au Pair

$834 ($10,000 per year divided by 12 months)

Au Pair Weekly Stipend

$800 stipend

Au Pair Bonus

$500

Cell Phones 

$160

Cleaning 

$500

[Total

$12,634]

Plaintiff also testified that her monthly expenses included extracurriculars; summer camps; unreimbursed medical; school expenses, which vary from month to month, depending on field trips, book supplies, class gifts; dining out; clothes; accessories; supplies; dry cleaning; insurance; transportation in the city (buses, subway, gas and tolls); and family trips. She also has additional expenses for: childcare if she must travel for work, an Apple watch for A., and birthday parties for the girls.
As for her lifestyle, exact monthly expenses, and ability to support the children, Plaintiff testified
So the lifestyle I am living right now is nothing like the lifestyle that I lived during our marriage. I'm eating like gross left-over chicken nuggets at work. I never ate chicken nuggets during my marriage, nor did our children; and its fine.
What's important is that they are happy, healthy, educated. But I can't - - I don't have an exact number for what my monthly expenses are just for me right now.
******
October child support still has not arrived. And whatever this Court decides, I don't know if Defendant is going to pay it or if he is just going to laugh it off.
I'm doing - - I've cut a lot of expenses, but I'm determined that the girls are still going to have what they have before; that they're going to not feel deprived, that they feel safe and protected and that they have a community and friends; that's what I'm trying to do.
******
Plaintiff has had to cut back on things she should not have to cut back on, such as which groceries to purchase. She relies on financial aid and the good-will and support of the family's community to assist with extracurriculars and summer camp. She testified that aid should not be given to their family because Defendant is a doctor and she is a law professor.
Plaintiff described a "Sharefile" (Plt. Ex. 57) to which she uploads all bills and receipts for family expenses that she pays, which Defendant is supposed to pay pursuant to the February [*11]2022 Order. Defendant is notified when Plaintiff uploads a bill and he has accessed the Sharefile drive and downloaded many of the bills. According to Plaintiff, Defendant is in arrears of the February 2022 Order in the total sum of $75,951.49 ($56,638.99 in child support add-ons; $15,712.50 in rent from November 2023; and $3,600 in October 2023 child support) (Plt. Ex. 86).
On cross-examination, Defendant did not question Plaintiff at all about the approximately $76,000 of arrears set forth in detail in her third contempt motion (Plt. Ex. 86) or the bills and receipts listed in the Sharefile (Plt. Ex. 57). Notably, however, Defendant consented to the admission into evidence of each of the bills and receipts underlying her reimbursement claim (Def. Ex. OOO — ZZZZZ). Defendant also did not cross-examine Plaintiff on her testimony about her contributions to the marriage and to his businesses.
Defendant did cross-examine Plaintiff about her side businesses. She explained that she started [xx LLC] during marriage but did not do anything with it. She started a dog walking business with girls after the divorce because the girls love animals and she wanted to bring them "joy"; it is not a revenue producing business and has no clients right now. Plaintiff also has [xx LLC], through which she has tried to publish some poetry. However, after deducting costs and expenses, the business has not earned any money. At one time, she offered consultation services for people going through a difficult marriage or employment issue, or if they needed contract review, and offered coaching services, but she did not secure any clients for this work.
Finally, Plaintiff opened [xx LLC], named for the girls — A., U., L. She described it as a "dream business," meant to be a long-term investment or real estate property to secure the children's financial future. Plaintiff became visibly upset in giving this answer.
Plaintiff has been awarded sole legal and physical custody of the children; she takes care of their every need which impairs her ability to work more than she presently does. As of the date of trial, Defendant had not sought visitation with the children in accordance with the Custody Decision. She believes Defendant resides [] in Manhattan based on where the family's Tesla is parked from time to time, which she can see on the Tesla app.
According to Plaintiff, Defendant has "hidden significant assets from" her and the children and she "know[s] that I will be chasing him for support and perhaps add-ons for many-many years." She testified that Defendant will "walk[] away with the vast majority of our money and assets that he has done everything to conceal" and that she and the children "will continue to struggle while he keeps his million-dollar earnings and valuable partnership." She asks the Court to consider Defendant's gross misconduct throughout the litigation in rendering its financial awards. As to equitable distribution of martial assets, Plaintiff requests that she be awarded:
• The North Creek Home, from which she will attempt to generate income while listing the property for sale;
• One-half of the date of commencement value of M.M. and ST LLC, as set forth in her expert report;
• One-half of the date of commencement values of all of bank accounts, investment accounts, and retirement accounts held in Defendant's name;
• One hundred percent of the four retirement accounts held in her own name. She asked that the balances two of her retirement accounts be used to offset the $76,000 of support arrears owed by Defendant;
• Title to the children's 529 Accounts, and any other savings and investment accounts held in trust or for the benefit of the children; and
• Title to the Tesla.
As for spousal support, Plaintiff requests $7,593.45 per month for 38-months after the date of the financial decision. As for child support, Plaintiff requests $13,636.58 per month in direct child support during the 38-month period that Defendant is paying spousal maintenance, with no contribution for add-ons (or $11,636.58 and 90% of add-ons). After the maintenance period ends, Plaintiff asks that child support be increased to $14,899.28 per month (or $12,899.28 and 90% of add-ons). Plaintiff asks that the basic child support amount be increased by $2,000 per month in lieu of setting an add-on percentage so that she can avoid having to chase Defendant for reimbursement of the add-ons.
According to Plaintiff, Defendant's obstructionist conduct throughout this litigation is an attempt to "financially suffocate" her and make sure she is "broke and homeless." As a result, she has incurred attorney's fees in this divorce matter in the sum of $503,633 (not including charges for January and February 2024); appellate fees in the sum of $84,160.37; and attorney's fees in the bankruptcy case in the sum of $267,454.48. She also paid Marcum, the accounting expert, the sum of $5,000. She asks that Defendant pay all of her attorney's fees.[FN3]

As far as Plaintiff knows, Defendant paid his attorneys the following: $100,000 to his first [*12]attorney Lee A. Rubenstein; $35,000 to his second attorney Noletti Law Group; $35,000 to his current attorney Mia Poppe; and $50,000 to his appellate counsel. 

EXPERT VALUATION OF M.M. AND ST LLC

Following voir dire, the Court qualified Mr. Pia from Marcum as an expert in business valuation and forensic accounting and admitted into evidence Mr. Pia's report, dated January 31, 2024, of the fair market value of Defendant's 100% equity interest in M.M. and ST LLC as of June 22, 2021 (Plt. Ex. 15).
Mr. Pia testified that he utilized methods generally accepted in the business valuation profession to perform his fair market valuation of M.M. and ST LLC. Mr. Pia explained that, when valuing a business, every valuator is required to consider all three valuation approaches which are the Income Approach, Asset Approach, and Market Approach.
He testified that a business valuation is usually based on the business' income tax returns, and the underlying documents used to create those returns, such as general ledgers, financial statements, bank account statements, credit card statements, and internal reports. Mr. Pia requested those financial documents for M.M. and ST LLC but was only provided with: M.M. and ST LLC's tax returns for 2020, 2021, and 2022; Defendant's personal tax returns for 2017 through 2021; and Defendant's Statement of Net Worth. Mr. Pia understood that Defendant had not produced any financial documents, such as general ledgers, financial statements, bank statements, or credit card statements, during the litigation. 
Mr. Pia testified that he did not use the Income Approach because he could not determine from the tax returns alone which expenses were non-operational and personal, but paid from the business, and therefore he could not determine the accuracy of Defendant's earnings. He did not use the Asset Approach because the businesses reported $1.6 million in sales alone in 2021 and their value "would not be maximized through the process of liquidation."
Mr. Pia explained that he used the Market Approach in his valuation because of a lack of available documents and data, and that he applied the "fair market standard of value" which is defined as the "price at which an asset would exchange hands between a hypothetical willing buyer and hypothetical willing seller and neither under compulsion to sell or buy and all parties knowing all relevant facts."
Mr. Pia valued Defendant's 100% equity interest in M.M. and ST LLC as of the date of commencement, June 21, 2021, at $914,000.00. 
Mr. Pia understood that the businesses provide anesthesia services for various procedures; that Defendant the is primary physician, owns 100% of M.M. and ST LLC, and pays himself a salary in the range of $186,000 to $240,000. Mr. Pia testified that Defendant is paying himself less than the average "market rate" salary for an anesthesiologist, which is $400,000 per year. Mr. Pia could not confirm from the tax returns alone if Defendant received income from the businesses in excess of his $200,000 salary.
In order to determine the fair market value of the businesses, Mr. Pia used the Mergers & Acquisitions ("M&A") method because he found sales of private companies comparable to the size of M.M. and ST LLC. He did not use the Guideline Public Company method because he was unable to find a sufficient number of sales of public companies comparable to the businesses.
In accordance with the standard methodology for the M&A method, Mr. Pia reviewed the tax returns provided to him; he reviewed the industry resources to find comparable transactions from which he selected appropriate transactions; and then he selected a "multiple" to apply to the M.M. and ST LLC's revenue to determine their fair market value (sales price).
Mr. Pia had to rely on the businesses' gross revenues as stated on the tax returns; he was unable to confirm their bottom-line income, which is the metric unit utilized. He explained
So the reason I selected revenues is because I assumed those are reported accurately. However, when dealing with the company's expenses, that is not always accurately performed, especially in the case of a closely held business where the owner owns a 100 percent interest.
And as I previously testified, that means he can pay himself any salary he would like. He could run personal expenses through the business, such as vehicles and such as personal expenses and that variety. Therefore, we are not able to confirm the operating expenses.
But we assumed that the revenues were accurate and representative of Defendant's revenue generations. And our valuation conclusion was based on the revenues of the company, not the income or the expenses.
Mr. Pia considered the business tax returns from 2020 and 2021, but only used one year, 2021, as that was "indicative of future representations of Defendant's medical practices." He explained, on cross-examination, that he used 2022 for "information purposes" and his review of those returns showed that the sales (revenues) increased. Mr. Pia also explained, on cross-examination, that the business valuation standards ask the valuator to consider all years but does not require that the valuator use all years. He testified that, although a full business cycle of a company is generally five years, he had sufficient information by way of the 2020, 2021, and 2022 business tax returns to support his valuation of M.M. and ST LLC.
Mr. Pia also testified that, if he had additional financial documents, he may have been able to employ one or more of the other generally accepted methods to perform his valuation or use the documents as a "confirmatory test" of his conclusions on the Market Approach. He testified that the absence of additional financial document does not disqualify his conclusions.
Mr. Pia chose a multiple of ".6" to apply to M.M. and ST LLC's gross revenues to determine their fair market value (sales price). He testified that .6 is "conservative" as ".8" applied to a sale of a company with revenues of $1.5 million. M.M. and ST LLC had combined gross revenues of approximately $1.6 million in 2021. Mr. Pia explained that he did not use .8 and took a "more conservative approach" because he is "unaware" of how the companies are [*13]"actually performing" due to the absence of documents. He then added .8 with .3, divided by two, and rounded up to .6. On cross-examination, Mr. Pia conceded that one-half of .11 (.8+.3) is .55, but explained that .6 is still the correct multiple based upon "multiple industry resources" which "confirm that .6 was a reasonable estimate."
Mr. Pia also explained on cross-examination that the cost of sale, such as fees and taxes, are manipulated into the multiple he chose and that the selected market transaction included a discount for lack of marketability. In addition, Mr. Pia also testified that, in determining the businesses' value, he took into consideration the $100,000 loan Defendant took from one of the business that resulted in a $100,000 deduction to the company.
DR. A.X.
In response to a subpoena served upon him by Plaintiff, Dr. X. produced an email, dated June 1, 2021, that he received from Defendant (Plt. Ex. 95) and testified at trial.
Dr. X. is an anesthesiologist and has been a colleague of Defendant since the early to mid-2000s when they worked in the same practice in New Jersey. According to Dr. X., Defendant reached out to him in June 2021 to discuss joining his practice. Defendant provided Dr X. with details about the practice as part of a discussion toward partnering up and having him "buy in" (Plt. Ex. 95). Defendant attached to the email a "partial list of locations" that provide work to the practice (a nine-page document), with specifics about the amount of work expected on an average weekly and monthly basis, and the prices paid for the work on a case-by-case basis.
In the email (Plt. Ex. 95), Defendant told Dr. X. that if he did not want to partner up, and instead wanted to remain on as an "independent contractor," he could still make $8,000 - $10,000 per week:
Even if you choose not to do room-air facelifts, room-air pediatric dental, room-air adult dental, you will still easily earn 8,000-10,000 per week, monday through friday. And if you are comfortable with egg retrieval anesthesia, I will connect you with the egg fertility guru who can get you at least 1200-1500 for 3 or 4 hours of work on Saturdays and Sundays as well.
Dr. X. characterized the email as a "carrot" and described the discussion as "possibilities of opportunity."
Dr. X. also explained that a text between himself and Defendant (Plt. Ex. 90), in which Defendant said "[s]he will hand you a wad 600/400," meant that he would be paid in cash $600 for the first hour, and $400 for each additional hour. He testified that Defendant did not have any anything to do with the transaction referenced in the text other than to explain that he would be paid in cash by the physician for whom he would be performing anesthesia. 
DEFENDANT'S TESTIMONY AND EVIDENCE
Defendant testified subject to the limitations of the Preclusion Order. However, the Court permitted him leeway in some areas.
As to marital assets, Defendant testified that M.M. pays the note on the Tesla, which is about $1,300 per month. He has paid 100% of the "maintenance and upkeep" of the North Creek Home since June 2021. However, he operates M.M. and ST LLC out of the North Creek Home three and one-half days a week and the businesses pay some expenses, such as electricity and snow removal. The businesses do not pay the mortgage because he does not want "problems" with the IRS. The businesses also do not pay rent to him for their use of the North Creek Home.
When questioned about his representations to this Court in December 2023 about his plan to pay down the mortgage arrears (Plt. Ex. 70), Defendant first testified that he did not make the extra payments because he needs approval from the lender to do so. He then testified that he asked the lender for permission to defer the delinquency payments "until the current situation is resolved to see if I can continue affording the residence." He acknowledged that he did initially plan to cure the arrears but testified that plans change. He stated: "Depending on the result of trial, things may change."
Defendant testified that he borrowed $20,000 from K.C. in December 2023 to pay down some of the mortgage arrears. When confronted with the text in which he told S. that he would send him "20k" to send to K.C. (Plt. Ex. 63), Defendant denied sending the text message and claimed that Plaintiff's attorney "planted" it.
Defendant testified that all his accounts were forced to be closed due to his bankruptcy case, which he filed voluntarily.
Defendant admitted that, since November 2023, he has logged on to the Sharefile (Plt. Ex. 57) at the direction of his bankruptcy attorneys. Notably, Defendant also consented to the admission into evidence of Plaintiff's back-up documents, which are the bills and receipts from the Sharefile, submitted in support of her third contempt motion (Def. Ex. OOO — ZZZZZ). He did not, however, offer his own proof showing that he paid any of those bills and receipts for which contempt is sought. The Preclusion Order did not prohibit such testimony or proof.
Defendant also did not offer any testimony or evidence tending to refute Plaintiff's testimony and evidence about her contributions as homemaker and to his businesses, none of which would have been precluded.
As to resolution of the financial issues in this divorce action, Defendant asks this Court to award him the North Creek Home because M.M. and ST LLC are registered there, his employees work there and he established a practice in the area. As for maintenance and child support, Defendant asks the Court to consider only the parties' personal tax returns and their W-2 income in determining their combined income, and then apply the CSSA guidelines thereto without any [*14]deviation.[FN4]

CREDIBILITY
The Court's credibility assessments for the parties on this financial trial are much the same as they were on the custody trial. Plaintiff is highly credible. She testified in a clear, consistent, and straightforward manner and her testimony about Defendant's income, the family lifestyle, and assets they acquired during the marriage was corroborated by the other credible proof in the record. Plaintiff's tone and demeanor was respectful and sincere, never argumentative. She was appropriately emotional when testifying about things that caused sadness and became visibly upset when testifying about the children's financial futures. 
Defendant, however, lacked credibility. His continued mantra that he has no money and earns only $200,000 per year is belied by the record, which contains his own admissions that he earns over $1,000,000 per year, that M.M. and ST LLC have little, if any, overhead, and that he pays his personal expenses through his businesses; as well as proof (contrary to his prior testimony) that he is sometimes paid in cash. The few documents that Defendant did produce in this litigation (i.e., TD Ameritrade statements and business tax returns) coupled with his own admissions about his income and ability to move money freely, flatly undermined Defendant's credibility. The family's lifestyle — including $150,000 of shelter costs and $100,000 in tuition alone — simply could not be sustained on $200,000 of W2 income. In addition, Defendant was argumentative, disrespectful, and glib while on the witness stand and while Plaintiff testified. His disdain for his family and the court proceedings was palpable.[FN5]

Mr. Pia is credible and the Court gives his testimony, report, and conclusions weight. Defendant's Frye objections to Mr. Pia's report are overruled as none of them purport to challenge the Market Approach method as "novel or experimental" (People v Byrd, 51 AD3d 267, 274 [1st Dept 2008] ["A Frye hearing is necessary only if expert testimony involves novel or experimental matters," it is not necessary when an expert applies an accepted theory to the specific factual record"]). Mr. Pia testified, as set forth in his report, that the Market Approach is generally accepted in the business valuation community (see Straus v Strauss, 136 AD3d 419 [1st Dept 2016] [generally describing content of admissible expert report and weight to be given thereto]; Zito v Zabarsky, 28 AD3d 42 [2d Dept 2006] [expert opinion supported by literature, reasoned methodology, and generally accepted scientific principles). Defendant's objections based upon Mr. Pia's choice of ".6" as the multiple; use of only one year of business tax returns; and allegedly failing to use "all available information," relate to the weight to be given to Mr. Pia's conclusions and are not Frye challenges. In any event, Defendant waived any challenge to the expert report based upon missing financial information, as he was the cause of such missing information, having failed to produce any documents during discovery (see generally Cahen-Vorburger v Vorburger, 12 AD3d 275 [1st Dept 2004] ["Likewise, in valuing defendant's interest in LCCI at $9,750,000, the expert, unable to perform 'due diligence' because of lack of adequate documentation, formulated a fair indirect methodology."]).
Dr. X. is also credible. He testified clearly and consistently about the June 2021 email and the text between himself and Defendant.
EQUITABLE DISTRIBUTION
Before the Court can distribute marital assets, it must first determine what they are (Fields v Fields, 15 NY3d 158, 161 [2010] ["the initial determination of whether a particular asset is marital or separate property is a question of law, subject to plenary review on appeal"]). In order "to give effect to the 'economic partnership' of the marriage," the term martial property is broadly construed (Fields v Fields, 15 NY3d at 163; DeJesus v DeJesus, 90 NY2d 643, 647 [1997] ["The statute is sweeping and 'recognizes that spouses have an equitable claim to things of value arising out of the marital relationship'"]; DRL § 236 B [1] [c] ["marital property shall mean all property acquired by either or both spouses during the marriage. . . and before the commencement of a matrimonial action, regardless of the form in which title is held"]). On the other hand, separate property, which is an exception to marital property, is construed narrowly (Fields v Fields, 15 NY3d at 163). The party claiming that an asset is separate property has the burden of proof on the issue (id.; DeJesus v DeJesus, 90 NY2d at 652 ["statutory presumption that all property, unless clearly separate, is deemed marital property and must further recognize the titled spouse's burden to rebut that presumption."]).
Plaintiff offered competent proof establishing the identity of each of the martial assets, and those which are her separate, premarital assets, and their values, as follows:
• Businesses: Defendant's 100% equity interest in M.M. and ST LLC as of date of commencement: $914,000.
• Real Estate: The North Creek Home, purchased in 2019 for $750,000, with an outstanding mortgage as of date of trial of approximately $517,000.
• Bank Accounts (date of commencement):
Defendant's Chase (x3793): $ 74,031.96;
Joint TD (x7029): $7,070.00; and
Plaintiff's Bank of America (x8311): $4,503.00.
$85,604.96
• Investment Accounts (date of commencement):
Defendant's TD Ameritrade (x9303): $662,387.38.
• Defendant's Retirement Accounts (date of commencement):
Fidelity IRA $393,387.11;
SEP-IRA $ 36,133.02; and
TD Ameritrade Roth IRA $ 97,776.62.
$527,296.75
• Plaintiff's Retirement Accounts (date of commencement):
Fidelity IRA $ 53,026 (premarital);
TIAA  $105,051 (part premarital);
NYS Retirement System $ 11,531; and 
TD Ameritrade Roth IRA $ 26,993.
$143,575 (excluding Fidelity IRA)
• Children's 529 Accounts (date of commencement): approx. $1,000,000.
• Automobiles: a Tesla and a Dodge Ram truck.
The Court finds that Plaintiff substantiated, by credible evidence, the values of the parties' bank, investment, retirements, and 529 Accounts, and the Court adopts Mr. Pia's expert valuation of Defendant's 100% equity interest in M.M. and ST LLC. Defendant, having willfully refused to participate in discovery, was precluded from presenting evidence at the financial trial to refute Plaintiff's showing on all these issues, which are determined in accordance with her proof (Plt. Ex. 27) (Schorr v Schorr, 46 AD3d 351 [1st Dept 2007] [husband "properly precluded [*15]from offering evidence at trial as to any financial issues because of his failure to timely comply with discovery requests concerning his businesses and to pay the fees of the expert appointed to value his business interests"]; Spector v Spector, 18 AD3d 380 [1st Dept 2005] [preclusion order proper]; Cahen-Vorburger v Vorburger, 12 AD3d at 276 [order of preclusion and default judgment supported by "ample evidence of defendant's contumacious failure to provide disclosure (CPLR 3126), and the court's valuation of his financial interests are supported by a fair interpretation of the available evidence"]). As for the value of the North Creek Home, although Plaintiff claimed the home's estimated value to be $925,000 at the time of trial, she did not submit any proof, such as an appraisal or comparable listings in the area, to substantiate that claim. Thus, the Court adopts Defendant's estimated value of $660,000 as it is based on an appraisal (Plt. Ex. 70).
Consequently, the net value of the martial estate (not including retirement accounts and 529 Accounts) is: $1,793,419.34, calculated as follows: North Creek Home net value $143,000 ($660,000 - $517,000) + Equity Interest in Businesses $914,000 + TD Ameritrade Account $662,387.38 + Bank Accounts $74,031.96 (The Court declines to distribute to either party any part of the joint account or Plaintiff's Bank of America account, as they were operating accounts used to pay family expenses.) The date of commencement value of Defendant's retirement accounts is $527,296.75, and the date of commencement value of Plaintiff's retirement accounts is $143,575. The children's 529 Accounts at date of commencement were approximately $1,000,000.
Once the marital assets and their values are established, the trial court has broad discretion in determining how to equitably distribute those assets considering all the circumstances (see Mahoney-Buntzman v Buntzman, 12 NY3d 415, 420 [2009] ["trial court has substantial flexibility in fashioning an appropriate decree based on what it views to be fair and equitable under the circumstances"]). Equitable distribution does not necessarily mean equal distribution (Arvantides v Arvantides, 64 NY2d 1033, 1034 [1985] ["there is no requirement that the distribution of each item of marital property be on an equal or 50-50 basis"]). Instead, the court considers sixteen factors in formulating a distributive award, including, inter alia, as is here relevant, the contributions of each party to the financial partnership; wasteful dissipation; the impossibility of ascertaining marital assets; and domestic violence, as that term is defined in the Social Services Law (DRL § 236 B [5] [d] [1-16]).
On this record, which speaks for itself, considering the statutory factors contained in DRL § 236 B (5) (d), and especially considering Defendant's physical, emotional, and financial abuse of Plaintiff and the children during the marriage and throughout this litigation, the following distributive award of marital assets to Plaintiff is equitable, just, and correct:
• 50% of the $914,000 value of Defendant's interest in M.M. and ST LLC, or $457,000;
• 50% of the date of commencement value of Defendant's TD Ameritrade account, or $331,193.69;
• 50% of the date of commencement values of Defendant's Chase account (x3793), or $37,015.98; 

• 50% of the date of trial net value of the North Creek Home, or $71,500;
• Exclusive use and occupancy of the North Creek Home;
• Plaintiff is appointed Receiver to rent and to sell the North Creek Home and to keep the entire net sales proceeds in satisfaction of her 50% share of the net value of the home ($71,500). Defendant's 50% share of the net value of the North Creek Home, or $71,500, shall be credited against Plaintiff's equitable distribution award of the businesses and bank accounts;
• 50% of Defendant's retirement accounts, or $263,648.37;
• 100% of her own retirement accounts; and
• Transfer of the children's 529 Accounts, and any other accounts in their names or held for their benefit, to Plaintiff.
At bottom, Plaintiff's equitable distributive award of the businesses and bank accounts ($457,000 + $331,193.69 + $37,015.98 = $825,209.67), and North Creek Home ($71,500), presuming she can recover it, has a value of $896,709.67, or 50% of those assets. The award shall be paid as follows: Defendant shall pay Plaintiff the sum of $753,709.67, which is the amount of her award minus the $143,000 she will recover from the sale of the North Creek Home (in other words, she will keep Defendant's $71,500 from the net sales proceeds of the North Creek Home). She is also awarded 50% of the marital portion of Defendant's retirement accounts, and his 50% share of her retirement accounts are used to offset his support arrears. The following factors support this equitable distribution award.
This is not a long-term marriage; the parties were married for just under 11 years. Plaintiff is 44, Defendant is 51, and they are both in relatively good health (DRL § 236 B [5] [d] [2]).
When the parties met in 2010, Plaintiff, an attorney in the public sector, was earning $75,000 per year and Defendant, an anesthesiologist, was earning $520,000 per year, or seven times Plaintiff's yearly income. By the date of commencement, Defendant's businesses had $1.6 million dollars in yearly revenues, the family lived in a Manhattan apartment with rent alone of $7,500 per month, they owned the North Creek Home, and had two vehicles — a Tesla and a Dodge Ram truck — which were kept in a Manhattan garage. The children attended private schools, with tuitions of $100,000 per year and engaged in expensive extracurricular activities, including skiing, all of which cost tens of thousands of dollars per year. The family travelled to Europe. They saved about $1,000,000 in the children's 529 Accounts, and Defendant had $680,000 in a TD Ameritrade investment account. All the family expenses were paid by marital earnings, Defendant never complained about being able to pay any of the expenses or claimed that the family was living above their means, and Plaintiff did not have a budget (id. § 236 B [5] [d] [1]).
Although, as this Court has found, Plaintiff established the identity and value of the marital assets of which she is aware, there may be other marital assets of which she has no idea. For instance, there may other bank and financial accounts, whether in Defendant's name or in the children's names or in his businesses' name, that are part of the marital estate that have not been disclosed. As amply shown in the record, it has been impossible to evaluate marital assets in the name or control of Defendant because he willfully failed to participate in discovery (id. § 236 B [5] [d] [10]).
Plaintiff made positive direct and indirect contributions to the acquisition and development of marital property during the marriage (id. § 236 B [5] [d] [7]). She left the workforce in 2011 when pregnant with A., the parties' first child, and stayed home to raise all three children and take of the home until 2018, when she returned to work. As noted in the Custody Decision, Defendant insisted that Plaintiff have children within two years of each other. He worked 85-100 hours per week throughout the marriage while Plaintiff took care the children, brought them to school, doctor's appointments, and attended to their every need. The Court discredited Defendant's claim that he had to hire "so many helpers" because Plaintiff did not want the children and did not take care of them as flatly contradicted by the overwhelming credible evidence at the custody trial. On the financial trial, Defendant did not refute Plaintiff's testimony that she indirectly contributed to his businesses by taking care of the kids and the home (see Cahen-Vorburger v Vorburger, 12 AD3d at 276 [increase in value of defendant business constituted marital property where defendant did not deny plaintiff indirect contributions]; Cash-Scher v Scher, 299 AD2d 193 [1st Dept 2002] [award to wife of one-half of defendant business]). Nor did he refute her testimony that she helped him vet office managers, unpack medical supplies, make phone calls, and organize office parties. In addition, when Plaintiff returned to work in January of 2018, she deposited her $75,000 yearly paycheck into a joint account and used it to pay family expenses. 
Plaintiff contributed everything to this marriage while enduring unending abuse from Defendant. The finding by this Court in the Custody Decision that "[t]his high-conflict divorce case involves domestic violence and abuse, both mental and physical" by Defendant against Plaintiff and the children, was substantiated by the overwhelming proof at the custody trial and is the law of the case (see People v Evans, 94 NY2d 499, 502 [2000] [court's resolution of issue within litigation constitutes law of the case]). Under DRL § 236 B (5) (d) (14), this Court shall consider whether a party has committed acts of domestic violence, as that term is defined in the Social Services Law § 459 (a), and the "nature, extent, duration, and impact of such act or acts" in determining equitable distribution of martial assets. SSL § 459 (a) includes in its definition of domestic violence, "harassment, aggravated harassment," as those acts are defined in the Penal Law and where they "have resulted in actual physical or emotional injury or have created a substantial risk of physical or emotional harm" to the victim or the victim's child. Although the statute references the Social Services Law, and by extension the Penal Law, for the definition of domestic violence, it does not require the court to make a finding that the offending spouse has violated the Penal Law, such that a Temporary Order of Protection or other remedy is [*16]warranted.[FN6]
The statute simply provides the court a standard by which to assess whether conduct amounts to domestic violence in the first instance.
Defendant harassed Plaintiff and his daughters within the meaning of the Penal Law [FN7]
throughout the marriage. As found by this Court, he grabbed and pushed Plaintiff, leaving bruises on her arms. He hit and hurt the children. ACS indicated a report against Defendant as it related to an incident in which he hit A. He threw and broke things while fighting with and yelling at Plaintiff, often in front of the children. He rampaged against Plaintiff and denigrated her in front of the children, calling her names (see Chigusa Hosono D. v Jason George D., 137 AD3d 631, 632 [1st Dept 2016] ["Petitioner testified that during one incident, respondent grabbed her by the neck, dragged her into the kitchen, pushed her to the wall, called her an obscene name, and threatened to punch her in the face."]). In one incident, he chased her around, berating her for several minutes as she begged him to leave her alone (see Jose M. R. v Arian S., 209 AD3d 549, 550 [1st Dept 2022] [harassment established where respondent "continued to follow [petitioner] in and out of the store as he pleaded with [him] to leave him alone"]). Defendant also called the children names; he would ask them if they wanted to be "fat," "a fucking retard," or "ignorant like your mother." His threats were made without provocation and served no legitimate purpose. Defendant's abuse during the marriage caused actual physical and emotional injury to Plaintiff and the children, and resulted in a dysfunctional and traumatic family dynamic. Defendant's abusive conduct reverberates in the daily lives of Plaintiff and the children, who required, and continue to be engaged in, therapy and treatment. Plaintiff's ability to earn and work more hours is hampered by the amount of attention and care that the children require.
Indeed, Defendant's harassment of his family continues to date albeit in a different form — financial suffocation — but has the same devastating impact and warrants the distributive award herein. Domestic abuse is pervasive and may spread into the divorce, seemingly without end. As noted in the Custody Decision, Defendant's present performance, during the divorce, is a mirror [*17]of his past performance during the marriage: controlling and abusive. Defendant has engaged in extreme and harassing litigation tactics to wear Plaintiff down financially and emotionally. He stopped paying the children's tuition, therapy, and rent for their home, destabilizing them, at the same time purporting to be fighting for them. Defendant has not seen his children in nearly three years by his own choice but has spent hundreds of thousands of dollars on failed litigation strategies. He claimed financial inability to pay expenses that he freely and willingly paid prior to June 2021. Nothing changed in his financial life post-commencement — he enjoys the income from his $1.8 million business, the North Creek Home and another home in Manhattan, the use of the Tesla, and likely many of the other luxuries he enjoyed during the marriage — but his wife and children have faced eviction proceedings, the children have been kicked out of school, their therapy has been jeopardized, and they no longer participate in the enrichment activities they once enjoyed.
Defendant's priorities are clear on this record: he cares only for himself. He liquidated his own children's college fund to bail himself out of jail, yet his incarceration was the lawful consequence of his own failure to pay his court-ordered support. He did not hire an attorney for the custody trial yet had attorneys for his bankruptcy case, appeals in this case, and the financial trial. Defendant's cries of poverty are undermined by the $1.8 million in revenue his businesses earned in 2022, with virtually no overhead because the businesses operate rent free in the North Creek Home. Defendant picks and chooses what he will pay and when: he paid the landlord $23,000 in September 2023 before Judge Glenn dismissed his bankruptcy case; he sought to send his colleague S. $20,000 in December disguised as a loan from "K."; and he paid the $14,000 garage lien in January 2024 on the eve of the financial trial so that he could take the Dodge Ram truck for himself. As Plaintiff testified, Defendant's course of conduct as to finances has alarmed and destabilized her and the children and served no legitimate purpose other than to fulfill his stated intention of making sure she is destitute.
In this Court's considered view, all of Defendant's conduct amounts to domestic violence that caused emotional injury to Plaintiff and the children and fits squarely within what this Court is now authorized to consider under DRL § 236 B (5) (d) (14). Distributive awards are meant to ensure that the equities are applied to reflect the contributions of each spouse to the partnership and to reach the right and just result as to marital property (Havell v Islam, 301 AD2d 339, 344 [1st Dept 2002] [where marital fault exists court compelled "to invoke its equitable power to do justice between the parties"]). The equitable distributive award to Plaintiff of 50% of the businesses, bank accounts, and North Creek Home, accomplishes the goal of the statute.
Consistent with Defendant's scorched earth approach to his wife and children's financial stability, he wastefully dissipated marital assets by failing to pay the mortgage on the North Creek Home, placing that asset at risk. He withdrew $183,500 out of his TD Ameritrade account within three months in late 2021/early 2022, at the same time he unilaterally stopped paying rent for the Marital Apartment, the children's therapy expenses and tuition. Defendant refused to produce any financial documents, making it impossible to uncover the extent to which he has dissipated, denuded, transferred, or hidden marital assets. He liquidated his own children's financial futures to bail himself out of jail for his own contempt of court. Presumptively, he used marital assets to pay his attorney's fees. Defendant's failed and frivolous litigation strategies cost [*18]hundreds of thousands of dollars. All of this amounted to wasteful dissipation (DRL § 236 B [5] [d] [12]).
Defendant's probable future financial circumstances, however, are quite good. He is an anesthesiologist, 51 and in good health. He owns two successful businesses, which generated $1.6 million in revenues in 2021 and over $1.8 million in 2022. He is in possession of the parties' art and other valuables acquired during the marriage. He is in possession of the lion's share of the parties' financial accounts. He may be in possession of undisclosed bank and investment accounts holding substantial sums of money. On the other hand, although Plaintiff earns a decent income, it is less than a middleclass salary for Manhattan. Her ability to pay the expenses for her children have been under constant threat by reason of Defendant's delay or total failure to pay support. At the time of trial, Defendant was in arrears of support in the sum of $76,000 (id. § 236 B [5] [d] [9]).
The Court notes here that it is not bound by Defendant's reported W2s income and the parties' tax returns to determine his yearly income (see Warshaw v Warshaw, 173 AD3d 582, 583 [1st Dept 2019] [court "appropriately looked beyond defendant's most recent tax return to consider his earnings history"]; Andre v Warren, 192 AD2d 491, 491 [1st Dept 1993] [support magistrate properly imputed income to mother "in an amount exceeding that reported" in her Federal tax return]). That Plaintiff signed the tax returns does not preclude her from challenging them at the trial (see Susko v Susko, 181 AD3d 1016 [3d Dept 2020]). Defendant, the sole owner of M.M. and ST LLC, chose for himself his yearly salary of $200,000, which is at least $200,000 less than the average salary of an anesthesiologist in 2024 (Plt. Ex. 15). Moreover, Plaintiff established that the family expenses were paid by the businesses — the AMEX summary shows some of them (Plt. Ex. 66) — and Defendant admitted as much during the trial: he testified that M.M. pays the Tesla note, and electric and snow removal at the North Creek Home. The undisputed proof of the family's lifestyle during the marriage — which included $150,000 in yearly shelter costs and $100,000 in tuition, in addition to skiing , travel and other luxuries — simply could not have been sustained on the reported yearly income, and so this Court may impute income based on the family's lifestyle (see Shurka v Shurka, 68 AD3d 488 [1st Dept 2009]; Cohen v Cohen, 294 AD2d 184 [1st Dept 2002]). In addition to the family's lifestyle, they saved $1,000,000 in 529 Accounts, $680,000 in a TD Ameritrade investment account, and purchased the North Creek Home.
Consequently, the Court adopts Defendant's stated income of $1,000,000 per year (Plt. Ex. 58) and imputes to him that yearly income amount (see Branche v Holloway, 124 AD3d 553 [1st Dept 2015] [imputation of $1 million yearly income]).
As noted above, the Court credits and adopts Mr. Pia's valuation of Defendant's date of commencement equity interest in M.M. and ST LLC at $914,000. Considering Plaintiff's direct and indirect contributions to the marriage, direct contributions to Defendant's businesses, and the domestic violence she and the children suffered at Defendant's hands which caused — and continues to cause — emotional harm, an award to Plaintiff of 50% of $914,000, or $457,000, is equitable and correct. As DRL § 236 B (5) (d) (14) is relatively new, the cases which have construed it are few, and apply the statute to reduce the abuser's interest in marital assets (see JN [*19]v TN, 77 Misc 3d 894 [Sup Ct, NY County 2022]). Here, however, the statute is applied to increase the other spouse's interest in martial assets. In addition, the 50% interest is borne out of all the circumstances in this case, not just the domestic violence Plaintiff and the girls suffered, but Plaintiff's demonstrated and unrefuted contributions to the marriage and businesses; Defendant's wasteful dissipation of marital assets; the parties' lifestyle; and the amount of maintenance that will be awarded to Plaintiff.
An award to Plaintiff of 50% of Defendant's Chase account, or $37,015.98, and 50% of his TD Ameritrade account, or $331,193.69, is also equitable and just. These accounts are assets that were acquired during the marriage. Defendant could not deny this fact. That these accounts were closed because of Defendant's voluntarily bankruptcy does not extinguish Plaintiff's 50% interest in the date of commencement values of those accounts, or Defendant's responsibility to pay her interest.
M.M. and ST LCC are illiquid assets. The TD Ameritrade and Chase accounts are also illiquid in that they do not exist. Therefore, Defendant shall pay to Plaintiff the total sum of $753,709.67(minus any credit to him for mortgage principal pay down from June 2021 [see below]), representing her equitable 50% share of these assets ($457,000 + $331,193.69 + $37,015.98 = $825,209.67) minus Defendant's $71,500 interest in the net value of the North Creek Home, within six months of the date of entry of the Judgment of Divorce (DRL § 236 B [5] [d] [8]). 
An award to Plaintiff of immediate occupancy and Receivership of the North Creek Home is equitable and just on this record. She has the greater need to immediately occupy the North Creek Home and to rent it so that she can pay the mortgage and carrying costs while she lists it for sale. Plaintiff may then sell the North Creek Home and keep the net sales proceeds, crediting to Defendant payments he made toward mortgage principal since June 2021. That credit, which may amount to somewhere between $30,000 - $40,000, shall be deducted from the amount Defendant owes Plaintiff on her distributive award of $753,709.67. As noted above, without considering the mortgage principal pay-down credit, as of the date of trial the equity in the home amounted to $143,000. Plaintiff may use the net sales proceeds to satisfy not only her equitable 50% interest in the $143,000 net equity of the home (valued at $71,500 at the time of trial), but also in partial satisfaction of any amount remaining on her distributive award of $753,709.67 (minus any credit) and/or the attorney's fees award (id. § 236 B [5] [d] [3]).
Defendant does not need to continue to occupy the North Creek Home. He has had exclusive use and occupancy of the North Creek Home since August 2021, has run his lucrative million dollar a year businesses from it, yet has failed to pay the mortgage, placing it at risk of foreclosure. Although Defendant made a "plan" to pay off the mortgage arrears — and represented to Judge Glenn and this Court that he made such plan — he glibly testified at trial that his plan changed and he now may or may not pay off the arrears depending on how this Court rules. Given Defendant's past performance, it is reasonable to presume that he may stop paying the mortgage if Plaintiff is awarded the home. Indeed, given the history of this case, the only real money that Plaintiff may realize from marital assets is any rent she collects from the North Creek Home and the net proceeds of its sale, together with her interest in Defendant's retirement [*20]accounts (as follows).
An award to Plaintiff of 50% of Defendant's retirement accounts — with a total date of commencement value of $527,296.75 ($393,387.11 + $36,133.02 + $97,776.62) — by way of transferring $263,648.37 from his IRAs to her TD Ameritrade Roth IRA is equitable and just on this record. Plaintiff established that those accounts are marital and, on this record, Plaintiff is entitled to 50% of those accounts. Defendant will not lose his IRAs, he will simply transfer 50% of the date of commencement values thereof to Plaintiff (id. § 236 B [5] [d] [4]). 
An award to Plaintiff of 100% of her own retirement accounts is also equitable and just on this record. Plaintiff established that her Fidelity IRA is premarital ($53,026). She did not establish the exact amount of her TIAA that is premarital. In any event, the total date of commencement value of Plaintiff's marital retirement accounts is $143,575 ($105,051 + $11,531 +$26,993) — 50% of which is $71,787.50. However, Defendant's 50% interest in Plaintiff's retirement accounts shall be applied to satisfy, at least in part, his support arrears as established at trial. 
Defendant did not refute Plaintiff's showing that he is in arrears of the February 2022 Order in the total sum of $75,951.49: $56,638.99 in child support add-ons; $15,712.50 in rent from November 2023; and $3,600 in October 2023 child support (Plt. Ex. 86). The Preclusion Order did not prevent Defendant from challenging Plaintiff on this issue. Consequently, this Court finds that Defendant owes Plaintiff the sum of $75,951.49 in arrears, as established at trial. Thus, Defendant's 50% interest in Plaintiff's retirement accounts, or $71,787.50 will be applied toward his $75,951.49 arrears, leaving a balance of $4,163.99. Moreover, given Defendant's conduct, it is desirable that Plaintiff retain her retirement assets "free from any claim or interference" by Defendant (id. § 236 B [5] [d] [10]).
In addition, Defendant is directed to immediately return all of the funds he took from the children's 529 Accounts, and any other accounts held in their names or in trust for them, during the pendency of this divorce action (see Spector v Spector, 18 AD3d at 381 ["court properly ordered defendant to return $180,000 he had taken from the children's custodial account"]) and turn the accounts over to Plaintiff to be transferred to her name and into her sole possession and control. 
The Court declines to award Plaintiff either of the family vehicles. Although both are marital assets, they appear to be encumbered by loans and their value and condition is not established on this record. The Court is reticent to saddle Plaintiff with another monthly debt that Defendant should have been paying. 
Plaintiff and the children are insured through her employer provided coverage. She will continue to maintain the children on her health insurance plan until their emancipation so long as she is eligible for employer-based health insurance coverage (DRL § 236 B [5] [d] [5]). 
As set forth below, Plaintiff is awarded post-judgment maintenance of $6,203.27 per month for 38 months (id. § 236 B [5] [d] [6]).
The Court has considered the tax implications of its equitable distribution award (id. § 236 B [5] [d] [11]). Plaintiff's award is being funded partially by transfer of funds between the parties' IRA accounts, and by Plaintiff taking occupancy of and then selling the North Creek Home. She will bear the closing costs of the home, including any capital gains taxes, which the Court has considered in awarding her this asset. Moreover, as Defendant did not produce any documents in this litigation, this Court is unaware of how he will fund Plaintiff's $753,709.67 equitable distributive monetary award (representing her 50% shares in Defendant's businesses and bank accounts, minus Defendant's $71,500 share of the net value of the North Creek Home). In the absence of any information as to the assets that he will use to satisfy Plaintiff's monetary award, this Court cannot consider, or make any direction as to, tax consequences or the parties' pro rata share of tax consequences. For all this Court knows, Defendant has another bank account — similar to the TD Ameritrade account he had in 2021 with a $680,000 balance — with funds sufficient to satisfy Plaintiff's equitable distributive monetary award. Therefore, he cannot object to the award solely upon the ground that the court did not consider tax consequences or reduce the distributive award of illiquid assets to reflect tax consequences (see Hartog v Hartog, 85 NY2d 36, 52 [1995] [court properly considered tax consequences and reduced wife's distributive share of illiquid assets by her equitable share of tax liability]). 
By reason of all the foregoing, the equitable distributive award to Plaintiff consisting of: (1) 50% of the date of commencement values of M.M. and ST LLC ($457,000); Defendant's TD Ameritrade investment account ($331,193.69) and bank account ($37,015.98), minus Defendant's $71,500 share of the North Creek Home, totaling $753,709.67 (minus any credit to Defendant for mortgage principal paydown from June 2021); (2) 50% of the date of trial net value of the North Creek Home, or $71,500, payable also from the net proceeds of sale of the home; (3) 50% of the marital portion of Defendant's retirement accounts; (4) 100% of her retirement accounts (as Defendant's 50% share of her retirement accounts are used to offset his support arrears); and (5) transfer of the children's 529 Accounts to Plaintiff, is equitable, appropriate, and just.
Attorney's Fees
DRL § 237 [a] provides counsel fees to a non-monied spouse "to enable that spouse to carry on or defend the action or proceeding, as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties." An award of attorney's fees is a matter within the sound discretion of the trial court given due regard for the financial circumstances of the parties and "all the other circumstances of the case, which may include the relative merit of the parties' positions" (DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881 [1987]); DRL § 237[a]). Where the monied spouse has taken unreasonable positions, caused unnecessary litigation, or engaged in obstructionist conduct an award of counsel fees to the non-monied spouse is appropriate (see e.g. Johnson v Chapin, 12 NY3d 461 [2009] [upholding award of $885,000 in attorney's and expert fees due to unnecessary delay and considering parties' financial positions]; Azizo v Azizo, 51 AD3d 438, 440—41 [1st Dept 2008] ["In light of the economic disparity between the parties and defendant's conduct during this action, the trial court providently exercised its discretion in awarding plaintiff counsel and expert fees"; attorney's fees of $664,538 and expert fees of $57,142 upheld]).
On this record, an award of counsel fees to Plaintiff in the total sum of $906,776.45, which represents the unpaid fees she incurred through the financial trial, is appropriate. From the outset, Defendant has engaged in obstructionist conduct, asserted meritless claims, and took positions resulting in delay and unnecessary litigation. During the three years since Plaintiff filed the complaint, Defendant has, inter alia:
• Been held in contempt twice for failure to pay court-ordered support;
• Filed a bankruptcy proceeding to avoid incarceration on the first contempt finding and to delay this divorce action via automatic bankruptcy stay. The Bankruptcy Court (Hon. Martin Glenn) dismissed Defendant's bankruptcy petition as without merit, and prohibited him from filing another bankruptcy action for six months;
• Willfully refused to engage in discovery proceedings and failed to produce any financial documents;
• Appealed various orders of this Court, without success;
• Sought to have Plaintiff's attorneys disqualified, sued them, and filed a grievance against them, also without success;
• Failed to exercise any parenting time during the litigation, but sought sole legal and physical custody at trial;
• Sued the prior jurist in Federal Court for alleged racial discrimination. The Federal District Court sua sponte dismissed Defendant's lawsuit and the Second Circuit Court of Appeals affirmed the dismissal, as the frivolousness of his lawsuit was "unmistakably clear" (Tewari v Sattler, 2024 WL 177445, 23-36-cv [2d Cir. 2024]); and
• Sought the recusal of this Court, also without basis (see Spector v Spector, 18 AD3d at 382).
All throughout the litigation, however, Defendant continued to operate his successful anesthesiology practice out of North Creek Home. In 2022, his businesses had $1.8 million in revenues and he spent hundreds of thousands of dollars to fund his litigation strategies yet liquidated his children's college savings accounts to purge his own contempt and bail himself out of jail. 
Defendant's conduct in this litigation far exceeds that which could be characterized as reasonable litigation strategy. To the contrary, the record makes clear that Defendant acted primarily to harass Plaintiff, delay proceedings, and drive-up litigation costs. Plaintiff outstanding attorney's fees of $906,776.45, consist of $555,161.60 for proceedings before this Court; $84,160.37 for Defendant's appeal in the First Department; and $267,454.48 for Defendant's bankruptcy action. These fees were necessarily incurred due to Defendant's own [*21]conduct, and the rates billed by Plaintiff's attorneys are reasonable given their experience. Moreover, Defendant did not submit a single legal bill from any one of his attorneys to establish the amounts he paid to them, or to substantiate any challenge to the reasonableness of Plaintiff's legal charges.
Accordingly, Plaintiff is awarded attorney's fees in the amount of $906,776.45, and $5,000 for expert fees, which shall be paid within six months of the date of entry of the Judgment of Divorce.
In addition, Defendant shall pay an additional $130,000 into the children's 529 Accounts to replenish those funds he improperly invaded to pay that part of the April 2022 Contempt Order as represented the interim award of attorney's fees. Defendant's claim that he has already paid $130,000 towards Plaintiff's attorney's fees by way of the $130,000.00 taken from his children's 529 Accounts, is shocking. His children paid his wife's attorney's fees from the money set aside for their future education. He must replenish that amount.
Defendant's argument that the totality of the circumstances does not warrant an award of attorney's fees to Plaintiff is equally without merit. Under controlling authorities, Plaintiff should not bear the costs of Defendant's harassing litigation strategy from her equitable distribution award (Johnson v Chapin, 12 NY3d 461; Azizo v Azizo, 51 AD3d 438). Given Defendant's conduct in this litigation — he has hidden, denuded, and transferred marital assets — it is not even guaranteed that Plaintiff will be able to recover the entirety of her equitable distributive award from which she would be able to pay her attorneys.
MAINTENANCE
The amount and duration of maintenance is a matter committed to the sound discretion of the trial court (Rennock v Rennock, 203 AD3d 675 [1st Dept 2022]; Spencer v Spencer, 230 AD2d 645, 648 [1st Dept 1996]). Post-divorce maintenance is appropriate in this case for a term of 38 months. Defendant concedes as much (Def. Ex. B for Id.).
Pursuant to DRL § 236 B (6), the Court must determine the guideline amount of post-divorce maintenance based upon the parties' incomes and applying the prescribed formula. Income for maintenance (and child support) is governed by the Child Support Standards Act ("CSSA") (DRL §§ 240 [1-b] [b] [5]; 236 B [6] [b] [3]). According to Plaintiff, her 2024 income is $115,000. This Court already imputed income of $1,000,000 to Defendant. After accounting for estimated CSSA deductions, Plaintiff's income for child support is $102,243.18 and Defendant's income is $930,042.68. The parties' combined CSSA income is $1,032,285.86.
Next, the Court performs two calculations up to a cap of $228,000 (id. § 236 B [6] [c]). The lesser amount of the two calculations is the guideline amount of maintenance. The first calculation is the difference between 20% of the payor's income (up to the statutory cap) and 25% of the payee's income. The second calculation is 40% of the parties' combined incomes, less the payee's income.
[*22]Calculation 1:
$45,600 [20% of $228,000] - $25,560.80 [25% of $102,243.18] = $20,039.20
Calculation 2:
$132,097.27 [40% of $330,243.18 ($228,000+$102,243.18)] - $102,243.18 = $29,854.09
The guideline amount of maintenance is $20,039.20 per year, or $1,669.93 per month. This amount is unjust and unfair and, having considered the factors set forth in DRL § 236 B (6) (e), the Court has determined to deviate from the statutory cap and sets the cap at $500,000, which results in a post-divorce maintenance award of $74,439.21 per year, or $6,203.27 per month for a period of 38 months, which is 30% of the duration of the marriage (id. § 236 B [6] [f]). As demonstrated in detail above — and thus unnecessary to repeat at length here — the statutory factors include, essentially, the same or similar factors used in this Court's equitable distribution analysis, to wit and inter alia: Defendant is 51, has a successful and highly lucrative anesthesiology business with revenues of $1.8 million per year; Plaintiff is a law professor who earns $115,000 per year and has sole custody of the parties' three young daughters, who still need a lot of care and therapy; Defendant's wasteful dissipation of marital property during the litigation, including hiding marital assets; Defendant's acts against Plaintiff that inhibited and continue to inhibit her earning capacity, including acts of domestic violence; the family's standard of living during the marriage, including having two homes, two cars, and luxury vacations; and the contributions and services of Plaintiff as a spouse, parent, wage earner and homemaker and to Defendant's career and businesses. 
The first post-divorce maintenance payment shall be made on the first day of the month in the month following entry of the Judgment of Divorce. Until such time, Defendant shall continue to make the support payments required under the February 2022 Order. 
CHILD SUPPORT

Plaintiff has sole custody of the parties' three children. The February 2022 Order requires Defendant to pay temporary monthly basic child support in the sum of $3,600, plus 100% of the children's add-on expenses, which at the time the order was issued included private school tuition, enrichment and extracurricular activities, therapy, costs of the au pair, and other expenses. Defendant has failed to pay the court-ordered add-on expenses. Plaintiff established at trial that he was in arrears in the sum of $56,638.99 in child support add-ons.
Applying the statutory cap of $183,000, using 29% for three children, results in a basic child support obligation of $53,070 per year or $4,422.50 per month (id. §§ 240 [1-b] [2]; 240 [1-b] [3] [i]). Without any increase in the cap, and after considering maintenance paid to Plaintiff, Defendant's pro rata share of the basic monthly child support is 83%. The guideline child support amount, however, is unjust and inappropriate.
Therefore, the Court will deviate from the income cap under the guidelines to set child support, as it did to set post-divorce maintenance, and set a $500,000 income cap to which it will apply the statutory percentages (Cassano v Cassano, 85 NY2d 649, 654 [1995] [when exceeding statutory cap, courts have discretion to apply the DRL § 240 [1-b] [f] factors "and/or" apply [*23]statutory percentages to income above cap]). A $500,000 income cap is appropriate given the financial resources of the parties and the children's standard of living during the marriage, as amply demonstrated in the trial record.
With a $500,000 income cap, under the CSSA guidelines, the monthly basic child support obligation for three children is $12,083.33. For the 38 months that Defendant is paying post-divorce maintenance, his monthly child support payment is $10,029.17, and his pro-rata share of add-ons is 83%. When Defendant's post-divorce maintenance obligation ends, his monthly child support payment increases to $10,886.54, and his pro-rata share of add-ons is 90%.
Although the Court recognizes that Defendant will likely not pay any of his children's add-ons willing and without additional litigation, given Plaintiff's proof at trial of the family's present monthly expenses, the child support award, coupled with the maintenance award, will cover the family expenses adequately. 
Accordingly, the first post-divorce child support payment shall be made on the first day of the month in the month following entry of the Judgment of Divorce and shall be in the sum of $10,029.17. Until such time, Defendant shall continue to make the support payments required under the February 2022 Order. 
Accordingly, it is hereby
ORDERED that Plaintiff is entitled to the following equitable distribution award of the parties' marital assets:
(1) 50% of the $914,000 date of commencement value of Defendant's interest in M.M. and ST LLC, or $457,000;
(2) 50% of the date of commencement value of Defendant's TD Ameritrade account, or $331,193.69;
(3) 50% of the date of commencement value of Defendant's Chase account (x3793), or $37,015.98;
(4) 50% of Defendant's retirement accounts, or $263,648.37;
(5) 100% of her own retirement accounts; and
(6) Immediate use and occupancy, and Receivership of, the North Creek Home; and
(7) Transfer of the children's 529 Accounts, and any other accounts in their names or held for their benefit, to Plaintiff; and it is further
ORDERED that Defendant shall pay to Plaintiff the sum of $753,709.67, representing [*24]her 50% equitable share of M.M. and ST LCC, the TD Ameritrade account and Chase account ($457,000 + $331,193.69 + $37,015.98 = $825,209.67), minus Defendant's 50% share of the date of trial net value of the North Creek Home ($71,500), minus any credit for Defendant's paydown of the mortgage principal on the North Creek Home from June 2021, within six months of the date of entry of the Judgment of Divorce; and it is further
ORDERED that Defendant shall transfer 50% of the date of commencement values of each of his retirement IRAs ($263,648.37) to Plaintiff's IRA, within thirty days of the date of entry of the Judgment of Divorce; and it is further
ORDERED that Defendant's 50% interest in Plaintiff's retirement accounts ($71,787.50) is applied to offset his support arrears of $75,951.49; and it is further

ORDERED that Plaintiff is entitled to immediate exclusive use and occupancy of the North Creek Home; and it is further

ORDERED that pursuant to separate Order issued simultaneously herewith, Plaintiff is appointed Receiver to rent and to sell the North Creek Home; and it is further
ORDERED that Plaintiff shall use any rental income from the North Creek Home to pay the mortgage and carrying charges; and it is further
ORDERED that Defendant shall be credited with payments he made toward mortgage principal since June 2021 and that amount shall be deducted from the amount Defendant owes Plaintiff on her distributive award of $753,709.67; and it is further
ORDERED that Plaintiff shall pay the closing costs for the sale of the North Creek Home, including capital gains taxes, and keep the entire net proceeds from the sale of the North Creek Home in satisfaction of her 50% equitable interest in the net value of the home as of the date of trial ($71,500) and in partial satisfaction of any amounts remaining on her equitable distributive award of $753,709.67 and/or the attorney's fees award herein; and it is further
ORDERED that Defendant shall cooperate in effectuating the sale of the North Creek Home, and shall sign all documents necessary to remove his name from, and effect a transfer of title for, the deed for the North Creek Home; and it is further
ORDERED that Defendant shall, within thirty days of the date of this Decision and Order, fully return and replenish the funds he took from the children's 529 Accounts, and transfer to Plaintiff the children's 529 Accounts, and any other accounts held in their name or for their benefit; and it is further
ORDERED that Plaintiff is awarded attorney's fees in the sum of $906,776.45, and expert fees in the sum of $5,000, which Defendant shall pay within six months of the date of entry of the Judgment of Divorce; and it is further
[*25]ORDERED that Plaintiff is entitled to post-divorce maintenance, and Defendant shall pay post-divorce maintenance, in the sum of $6,203.27 per month for a period of 38 months. The first payment shall be made on the first day of the month in the month following entry of the Judgment of Divorce. Until such time as the first post-divorce maintenance payment is due, Defendant shall continue to make the support payments required under the February 2022 Order; and it is further
ORDERED that Defendant shall pay monthly basic child support in the sum of $10,029.17, and 83% of add-ons, for the 38 months that he is paying post-divorce maintenance. Defendant shall pay monthly basic child support in the sum of $10,886.54, and 90% of add-ons, when his post-divorce maintenance obligation ends. The first monthly child support payment is due one the first day of the month in the month following entry of the Judgment of Divorce, together with the first post-divorce maintenance payment; and it is further
ORDERED that all other request for either equitable distribution or support are denied; and it is further
ORDERED that Plaintiff established that the February 2022 Order is a lawful order of the court, which expresses an unequivocal mandate and has been full force and effect, that Defendant disobeyed the February 2022 Order by failing to pay support thereunder, that Defendant had knowledge of the February 2022 Order, and that his failure comply with the directives thereunder as to payment of support has prejudiced Plaintiff's rights; and it is further
ORDERED that Defendant failed to present any competent evidence establishing a defense to his disobedience of the February 2022 Order or tending to raise a question of fact on such defense; and it is further
ORDERED that Ms. Kohlu is entitled to a fine in the total sum of $4,163.99 ($75,951.49 in arrears minus credit of $71,787.50 for Defendant's 50% share of Plaintiff's retirement accounts), representing the arrears that Defendant owes to her under the February 2022 Order. Defendant shall pay Plaintiff the sum of $4,163.99 within thirty days of the date of entry of the Judgment of Divorce; and it is further
ORDERED that Plaintiff shall submit to this Court for signature, upon notice to Defendant (22 NYCRR 202.48), a proposed Judgment of Divorce within thirty (30) days of this Decision and Order. 
Dated: July 8, 2024
HON. KATHLEEN WATERMAN-MARSHALL

Footnotes

Footnote 1:References to "Plt. Ex. __" and "Def. Ex. __" are to the exhibits admitted during the financial trial held on February 8 and 9, 2024.

Footnote 2:References to "NYSCEF VEC 2 Doc. ___" are to the document number in the evidence courtroom for the financial trial.

Footnote 3:On consent, the Court considered Plaintiff's request for attorney's fees on papers without the need for a hearing. At trial, Plaintiff's attorney's legal invoices in this divorce matter (June 2021 — December 2023), on the appeal, and on the bankruptcy matter, were admitted into evidence (Plt. Ex. 33 — 35). In addition, Plaintiff's attorney submitted an Affirmation, dated February 20, 2024, to which is attached an updated invoice showing charges in this divorce matter through the end of January 2024. In total, Plaintiff requests attorney's fees in the sum of $906,776.45. Defendant opposed Plaintiff's request for fees by way of his attorney's Affirmation, dated March 5, 2024. Defendant did not submit any legal invoices from any of his attorneys.

Footnote 4:Other than testifying that he wants to keep the North Creek Home, Defendant did not make any other requests, during his testimony, about the disposition of marital assets, maintenance, or child support. However, according to his Statement of Proposed Disposition, which was marked only for identification (Def. Ex. B for Id.), he claims equity in the home of $143,876.10, from which he seeks a credit off the top of $30,364.68. He then proposes to buy out Plaintiff's one-half share of the remaining $113,511.42 equity, after reallocating expenses to her for the children's therapy and legal fees. In addition, Defendant proposes that the parties keep their respective bank and brokerage accounts, and that they split their retirement accounts 50/50. He proposes that they keep the vehicles that are in their respective possession and that Plaintiff pay her own attorney's fees.
Footnote 5:In response to the Court's admonition that Defendant's counsel cease speaking over and arguing with the Court, and the Court's exercise of its duty to maintain proper courtroom decorum, counsel requested that the Court recuse herself. Counsel also requested recusal when the Court enforced the Preclusion Order by limiting Defendant's testimony. Each motion to recuse was carefully considered and denied (People v Moreno, 70 NY2d 403 [1987] [judge is sole arbiter of need for recusal and her decision is a matter of personal conscience]; Mercedes E.H. v Dexter R.N., 197 AD3d 1038 [1st Dept 2021][same]). Indeed, a judge is obligated not to recuse herself unless she is satisfied that she is unable to serve with complete impartiality, in fact or appearance (Fulton Mkt. Retail Fish Inc. v Todtman, Nachamie, Spizz & Johns, P.C., 158 AD3d 502 [1st Dept 2018] ["the record does not demonstrate that the court was so vexed that it could not be impartial"]).
Footnote 6:The Assembly debate on the passage of the Bill that amended DRL § 236 B (5) (d) to include section (14), is informative as to the legislature's intent on the type of proof the court should consider when applying the amended statute, to wit: the court should "consider an affidavit that the alleged domestic violence filled out as a part of the divorce proceedings saying, I was a victim of domestic violence and these are my allegations"; not anticipated for the court to consider domestic violence allegations only where there is "a criminal conviction, for example, or criminal charges" (NY Assembly Debate on 2020 NY Senate-Assembly Bill S7505B, A9505B, April 1, 2020 at 215).

Footnote 7:A person is guilty of harassment in the first degree "when he or she intentionally and repeatedly harasses another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury (Penal Law § 240.25). A person is guilty of harassment in the second degree when he "engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose" (id. § 240.26).